**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| **WILLIAM FERTIK and GRETA FERTIK,** | ) | |
| | ) | |
| | ) | |
| | ) | Civil Action No. |
| **Plaintiffs** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **WILLIAM STEVENSON, M.D.;** | ) | |
| **MELANIE MAYTIN, M.D., ABBOTT LABORATORIES,** | ) | |
| **and ABBOTT VASCULAR, INC.** | ) | |
| **Defendants.** | ) | |

_____)

## COMPLAINT AND DEMAND FOR JURY TRIAL

### PARTIES

1.      Plaintiff, William Fertik ("Mr. Fertik"), is an individual who at all times relevant was and is a resident of New York City, New York.

2.      Plaintiff Greta Fertik ("Mrs. Fertik") is an individual who at all times relevant was and is a resident of New York City, New York.  (Hereinafter, Mr. Fertik and Mrs. Fertik are sometimes collectively referred to as "the Plaintiffs.")

3.      Defendant William Stevenson, M.D. ("Dr. Stevenson") is an individual who at all times relevant has been a resident of Needham, Massachusetts.  Dr. Stevenson is a physician specializing in the fields of cardiology and electrophysiology at Brigham & Women's Hospital in Boston, Massachusetts.

4.      Defendant Melanie E. Maytin, M.D. ("Dr. Maytin") is an individual who at all times relevant has been a resident of Massachusetts.  Dr. Maytin is a physician with a specialty in cardiology and in conjunction with Dr. Stevenson, rendered medical services to Mr. Fertik at

the Brigham & Women's Hospital on and after May 6, 2009.

5.      Defendant Abbott Laboratories ("Abbott") is a corporation duly organized under the law of the state of Illinois with a principal place of business located at 100 Abbott Park Road, Abbott Park, Illinois 60064.  Abbott Laboratories has a substantial presence worldwide in the consumer, pharmaceutical, and medical device markets.  Abbott has a substantial and ongoing commercial presence in the Commonwealth of Massachusetts such that its transaction of business subjects it to general and specific jurisdiction of courts within the Commonwealth including this federal forum pursuant to the Massachusetts Long Arm Statute G.L.c. 223A §3, *et seq*.

6.      Defendant Abbott Vascular, Inc. ("Abbott Vascular") is a Delaware corporation with its principal place of business in California.  Abbott Vascular is a wholly owned subsidiary of Abbott.  Abbott Vascular regularly transacts business in Massachusetts and this lawsuit arises out of its Massachusetts commercial activity, including but not limited to its Abbott Vascular device Hi Torque BHW Wire, Model 1000463H which was sold in Massachusetts in 2009 in a defective condition and caused injury to the Plaintiff Mr. Fertik.  Abbott Vascular is subject to suit in this forum pursuant to the Massachusetts Long Arm Statute G.L.c. 223A §3, *et seq*.

## DIVERSITY JURISDICTION

7.      Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this case because it is a lawsuit between parties of diverse citizenship and the amount in controversy exceeds $75,000.

## VENUE

8.      Venue is proper in this Court under 28 U.S.C. § 1391 because the events, negligence, gross negligence, utilization of a defective Abbott medical wire and other wrongful

2

conduct that gives rise to the Plaintiffs' claims occurred in this district.

## FACTS COMMON TO ALL COUNTS

9.      This is a medical malpractice, product liability and spoliation of evidence case arising out of serious neurological injuries suffered by Mr. Fertik as a consequence of the negligence, gross negligence and/or wrongful conduct of the named defendants set forth hereafter.  The tortious actions and inactions of the defendants occurred on and after May 6, 2009 at the Brigham & Women's Hospital in Boston, Massachusetts.  Mr. Fertik's neurological, stroke-related injuries, sustained in and after the May 6 to May 10, 2009 period at Brigham & Women's Hospital, persist through the present time and are permanent in nature.

10.      Mr. Fertik, age 69, is an internationally known documentary and commercial film maker who has won a Motion Picture Academy Award (1973), three (3) Television Industry Emmy Awards, (1991, 1979 and 1977), and the New York Film Festival Gold Medal among myriad other cinematic awards during the course of his forty plus year professional film making career.  As a director, writer and/or producer he has conceived and directed major television advertising campaigns -- telecast in the United States and Europe – for such significant clients as AT&T, Fiat, Pontiac, Nestle, Amnesty International, The United Way, Blue Cross/Blue Shield, Mutual of Omaha, Kellogg's and Merck Pharmaceuticals among many other corporate entities and public interest campaigns/causes.  He has received all major professional awards in the television commercial field.  His expertise as a director, writer and/or producer of televised classical music and Opera concerts is internationally recognized and include among many other television performances:  The Thirteen (13) hour *Leonard Bernstein/Beethoven* series for the Public Broadcasting Service ("PBS") and British Broadcasting Company ("BBC") in 1982; the acclaimed 90 minute PBS telecast of *The VII International Van Cliburn Piano Competition*

(1985); *Itzak Perlman in Russia* (1991); *The IX International Tchaikovsky Competition* (1990); *La Boheme with Pavarotti and Scotto Live From Lincoln Center* (PBS, 1977) and *Sutherland and Pavarotti in Concert Live From the Metropolitan Opera* (PBS, 1979).

11.     The negligent, grossly negligent, defective product and wrongful acts of the defendants detailed hereafter are the proximate cause of serious neurological, physical, emotional, economic and career injury to Mr. Fertik, as well as to related and derivative emotional, physical and personal injuries to Mrs. Fertik, Mr. Fertik's wife of 35 years.

**The Cardiac Ablation Procedure**:

12.     Mr. Fertik was admitted to the Electrophysiology Service of Brigham & Women's Hospital (hereafter sometimes "B&W") on May 6, 2009 for a radiofrequency cardiac ablation procedure to be performed by the defendant Dr. Stevenson.  The ablation procedure began at 12:31PM and continued until 6:12PM on May 6, 2009 in the B&W Electrophysiology Department.  The ablation procedure was for the treatment of Mr. Fertik's recurrent heart atrial fibrillation condition (i.e., irregular and rapid heart rhythm).

13.     On May 6, 2009, Dr. Stevenson was assisted in the multi-hour cardiac ablation procedure by the defendant Dr. Maytin.

14.     The cardiac ablation procedure involved, among other features and medical modalities, the insertion of a 300 cm long Abbott and/or Abbott Vascular manufactured, marketed and/or distributed Hi Torque BHW wire, Model 1000463H (the "Abbott wire" or "the guide wire") initially into Mr. Fertik's groin area and then threaded by Dr. Stevenson and/or Dr. Maytin into Mr. Fertik's chest and heart area.

15.     The Abbot wire was utilized by Drs. Stevenson and Maytin and their B&W colleagues as part of the radiofrequency ablation procedure that Mr. Fertik underwent.  This

procedure uses radiofrequency to "ablate" (that is, literally to burn away cardiac muscle tissue from which the abnormal cardiac rhythm originates) in Mr. Fertik's heart in an effort to remedy, or materially decrease, his periodic atrial fibrillation and associated cardiac rhythm irregularities.

16.     To address his atrial fibrillation condition Mr. Fertik had undergone prior, but not fully successful, radiofrequency ablation procedures in November 2007 and March of 2008.  Mr. Fertik in each instances, including that of May 2009, entrusted his care to, and expressly relied upon, the cardiac and electrophysiology expertise of Dr. Stevenson, and his B&W colleagues to perform the cardiac ablation with all the requisite and customary medical skill, care and attention to each phase of the procedure required by the applicable medical standard of care, during and after the procedure.

17.     At the conclusion of the May 6, 2009 ablation procedure, Drs. Stevenson and Maytin owned duties of care to Mr. Fertik which included, among many other obligations, accurately to account for each and every component part of the catheters, radio frequency device, guide wires and all other medical tools or devices – including the entire Abbott wire – and to confirm that none remained improperly in or near Mr. Fertik's heart or chest as a "retained foreign object."  The Defendants each and collectively breached, by negligence and other wrongful tortious conduct, the duty of care owed to Mr. Fertik at and after the conclusion of the cardiac ablation procedure of May 6, 2009.

**The Failure to Diagnose the Fractured Abbott Wire**

18.     During the ablation procedure a 15.5 inch portion of the Abbott wire – due to what Dr. Stevenson reported to the Plaintiffs and B&W, through its  Risk Management Attorney David Seaver, reported in writing to federal and Commonwealth governmental agencies to be "... *a structural defect in the wire...*" (emphasis added) – broke inside Mr. Fertik's body.

19.     The Abbott wire – whether due:  (a) to the "structural defect" reported by B&W's Attorney Seaver and Dr. Stevenson and/or; (b) due to negligent excess force employed by Dr. Stevenson, Dr. Maytin or both on the wire during the ablation procedure – was caused to sever and a 15.5 inch portion of the Abbott wire remained in Mr. Fertik's chest extending dangerously from the left ventricle into the upper pulmonary vein of his heart at the conclusion of the ablation.

20.     As a consequence of acts of negligence, inattention, recklessness and/or gross negligence by Drs. Stevenson and Maytin, the severed 15.5 inch Abbott metal guide wire remnant remained undetected inside Mr. Fertik's chest and heart throughout the following three and one-half days and nights while he was an in-patient at B&W – May 6th, 7th, 8th and through the morning of May 9th, 2009 even after discharge on the Morning of May 9th, 2009.  For this to have occurred in 2009 at the Harvard Medical School affiliated, major teaching hospital and academic medical center Brigham & Woman's Hospital in Boston – where virtually every medical and scientific advantage, diagnostic tool, technological resource and, sophisticated, clinical physician talent is allegedly present – is medically inexcusable and is the proximate cause of serious harm to the Plaintiffs.

21.     The medically negligent and harmful conduct that gives rise to this case -- both the severing of the defective Abbott wire inside Mr. Fertik's body on May 6, 2009 and the related negligent and/or grossly negligent failure of the named defendant physicians timely to diagnose and remove the broken 15.5 inch Abbott wire in the multiple days that followed through May 10, 2009 -- caused Mr. Fertik on and after May 6, 2009 to suffer a series of "embolic events" or strokes and documented brain tissue loss proximately caused by the presence of the Abbott wire "retained foreign object" in his body.  From these injuries Mr. Fertik

has not and will never fully recover.

22.     Early on the morning of May 7, 2009, while still in-patient at B&W, Mr. Fertik was seen by Dr. Stevenson, Mrs. Fertik and other B&W physicians to exhibit neurological deficits including thickened/garbled speech (dysarthria), logic impairment and other unexpected cognitive abnormalities.  Mr. Fertik was seen and evaluated by Dr. Stevenson at or about 8:25AM on May 7, 2009.  Dr. Stevenson was aware of Mr. Fertik's neurological and thickened speech symptoms when it was only some fourteen (14) hours post-ablation procedure.  Dr. Stevenson knew, or should have known, the symptoms then manifest by his patient were diagnostic of "embolic events" or strokes arising from intra or post ablation procedure causes including a possible retained foreign object.

23.     Dr. Stevenson in his 8:25AM May 7th notation to the B&W medical chart expressly noted the need for him and others to check and review a chest x-ray of Mr. Fertik to be taken that morning.  Moreover, Dr. Stevenson noted on the morning of May 7th abnormal lung ausculatory findings on the lung exam when listening to Mr. Fertik's chest via stethoscope.  The abnormal lung sounds and symptoms were in fact due to the presence of the fractured 15.5 inch Abbott wire which remained undetected and undiagnosed in Mr. Fertik's chest and pulmonary vein.

24.     Dr. Stevenson negligently failed to reach or even consider that "retained foreign object" diagnosis or review the chest x-ray for the next three days despite:  (a) acknowledging the need on the morning of May 7th for he and others involved in Mr. Fertik's case to "check the chest x-ray"; (b) labeling the need for the chest x-ray and its review as diagnostically "urgent"; and (c) expressly advising the B&W Radiology Department that the taking and review of the chest x-ray was a necessary precondition to his patient, Mr. Fertik's "discharge" from B&W.

25.     Although labeled "urgent" and "necessary for discharge," Mr. Fertik's chest x-ray was negligently not taken until shortly after 7:00PM on May 8, 2009 -- another <u>thirty four and one half (34.5) hours</u> following Dr. Stevenson's 8:25AM note of May 7, 2009.  During the same period Mrs. Fertik made repeated requests, and ultimately a formal complaint, regarding the undue delay in the conducting of diagnostic tests, including a chest x-ray, to determine the cause or causes of her husband's neurological injuries.  These requests by Mrs. Fertik failed to speed the diagnostic process.  More negligent, and indeed grossly negligent, is the fact that the critical chest x-ray which plainly and unequivocally showed the broken 15.5 inch metal Abbott wire located in Mr. Fertik's chest and pulmonary vein was not reviewed by Dr. Stevenson, Dr. Maytin, by B&W consulting neurologists who were brought in by Dr. Stevenson to evaluate the possible causes of Mr. Fertik's neurological deficits or by <u>any</u> B&W radiologist until 11:30AM on May 9, 2009 – <u>an additional sixteen and one half (16.5) hours</u> after the diagnostically critical chest x-ray was belatedly taken.

26.     Astonishingly, Mr. Fertik was discharged from B&W by Dr. Stevenson at 9:30AM on the morning of May 9, 2009 without <u>anyone</u> at B&W having reviewed the aforementioned chest x-ray which unambiguously depicted the fractured Abbott wire/retained foreign object in Mr. Fertik's body.  At the time of discharge – still symptomatic with speech and cognitive injuries – Mr. Fertik's clinical diagnosis was deemed to be an "acute embolic event" (i.e., stroke) documented on CT scan and MRI scans of the brain ordered and reviewed by consulting B&W neurologists on May 8, 2006.  The existence of the retained, fractured 15.5 inch Abbott wire inside Mr. Fertik – the actual and true cause of his "acute embolic event" -- remained undiagnosed and undetected by Dr. Stevenson and/or Dr. Maytin at the time of Mr. Fertik's hospital discharge.  The physician defendants' failure of diagnosis, on the above

facts, constituted medical negligence and/or gross negligence.

27.     Mr. Fertik's Abbott wire/retained foreign object related brain injuries were thus caused to occur, to continue to occur and to compound on May 6, May 7th May 8th May 9th up to and including the Abbott wire belated removal at B&W on May 10, 2009 by Dr. Andrew C. Eisenhauer, an interventional Cardiologist colleague of Dr. Stevenson.

28.     Mr. Fertik was discharged from B&W by Dr. Stevenson on May 9, 2009 at or about 9:30AM.  Thereafter at or about 11:30AM Dr. Stevenson was contacted by a Dr. Souza of the B&W Radiology Department and informed that the belatedly taken 7:12PM May 8, 2009 chest x-ray had just been read, was abnormal and showed a retained guide wire near the heart. Mr. and Mrs. Fertik, then in transit to their home in New York City, were contacted by Dr. Stevenson by phone and requested to return to the hospital on an emergency basis. Mr. Fertik was re-admitted to B&W at 12:53PM and underwent further radiological evaluation of the retained Abbott wire.

29.     After Mr. Fertik's re-admission to B&W, a new May 9th CT scan further confirmed the presence of the fractured 15.5 inch Abbott wire and established its location as extending into the left atrium of his heart with a distal portion located on the left superior pulmonary vein and proximal position in the left inferior pulmonary vein.

30.     On May 10, 2009 the remnant 15.5 inch guide wire was extracted by Dr. Eisenhauer of B&W's interventional cardiology service.  Dr. Stevenson on May 12, 2009 noted in a letter to Mr. Fertik's referring physician, Dr. Edward R. Tuohy:  "I am suspicious that there may have been a structural defect in the wire [and] I am also suspicious that the retained wire was a source of emboli."  In the course of Mr. Fertik's re-admission to B&W – and in subsequent conversations – Dr. Stevenson orally represented to the Plaintiffs that the fracture in

the Abbott wire was due to "… the wire being defective."

31.     A product liability negligent design/defective manufacturing claim against Abbott and Abbott Vascular as the manufacturer, marketers and/or distributors of the guide wire arising from its "…structural defect…" is factually warranted and hereby declared by the Plaintiffs.

32.     The timely diagnosis of the fractured Abbott wire in Mr. Fertik's chest and pulmonary vein required the appropriate and timely evaluation of the chest X-ray, which the defendant physicians negligently failed to do or cause others at B&W to do within a clinically reasonable time.  However, it is also the routine and cardiac electrophysiology standard of care at the conclusion of a cardiac ablation such as Mr. Fertik's to scan the entire chest with fluoroscopy at the end of the interventional cardiac procedure to rule out foreign body retention, pneumothorax, bleeding and other potentially life-threatening conditions. In the May 6, 2006 B&W fluoroscopy records there is no evidence that this standard of care and practice was properly performed.  The failure to do so by either Dr. Stevenson or Dr. Maytin are independent acts of medical negligence.

33.     Specifically, neither Dr. Stevenson nor Dr. Maytin describe this practice at the end of the procedure in their summary note of May 6, 2009. The position of the fractured wire should have been easily seen at the end of the procedure with routine fluoroscopy. While over the ensuing 24 hours, the Abbott wire may have migrated to the position ultimately seen on the belatedly taken, belatedly read May 8, 2009 chest x-ray, the fractured wire would have been even more proximal at the end of the ablation procedure in the electrophysiology laboratory on May 6, 2009. Dr. Stevenson observed in his note to Mr. Fertik's physician, Dr. Edward Tuohy in Fairfield, CT, the following points regarding the eventual diagnosis of the retained wire as also seen on a CT of the chest taken on May 9, 2009 after Mr. Fertik had returned to the hospital:

> *CT scan confirmed the presence of the wire extending into the LA with the distal portion in the left superior PV and proximal portion in the left inferior PV. We had not seen it on fluoroscopy as the radiopaque distal segment was in the lung beyond our fluoroscopy field at the time of the procedure and we had not appreciated that it had fractured somewhere within the needle as we met no resistance on removing the needle and wire together from the dilator after achieving access to the LA*

34.   As Dr. Stevenson describes in his own note, the wire was in the left atrium and the field of the left atrium is within the central field of the fluoroscopy --- this fact refutes Dr. Stevenson's assertion that the wire could not be seen on fluoroscopy at the end of the procedure. Based upon the B&W medical chart, there is no evidence that the scan of the field with fluoroscopy was performed properly, if performed at all, at the end of the procedure in the electrophysiology suite by either Dr. Stevenson or Dr. Maytin.

35.   On May 14, 2009 an Adverse Incident Report ("AIR") required under G.L.c. 111, ¶51H was submitted by B&W, through Attorney David Seaver B&W's "Risk Manager," with the Massachusetts Department of Public Health. The May 14, 2009 AIR report sent to the Department of Public Health by B&W inaccurately states:

> *While the ablation procedure is performed under fluoroscopy, it is low-dose fluoroscopy making the wire difficult (to) visualize on the fluoroscope. The radiopaque portion of the wire was in the peripheral lung field which is not in the fluoroscopy field.*

36.   Fluoroscopy is routinely used to aid in the identification, position (and removal) of cardiac wires and catheters and, at the conclusion of an ablation procedure, the field of fluoroscopy can be easily extended. As described in Dr. Stevenson's own note, the wire was in the left atrium yet, inexplicably, was not seen or diagnosed, which should have been done on May 6, 2009.

37.   In the May 14, 2009 AIR report to the Massachusetts Department of Public Health, Attorney Seaver further states that:

> *The retained guide wire is the likely source of the emboli, ….*

Attorney Seaver's report is consistent with Dr. Stevenson's own note that states:

> *I am suspicious that there may have been a structural defect in the wire*
> *contributing. I am also suspicious that the retained wire was a source of emboli.*

38.     The opportunity to diagnosis the retained Abbott wire and retrieve it immediately

post ablation procedure in the electrophysiology laboratory on May 6, 2009 was missed due to

the negligent deviation from the standard of care by Drs. Stevenson and Maytin.  The

opportunity was again missed early on May 7, 2009 when Mr. Fertik's crucial chest x-ray was

not obtained in a timely fashion until the evening of May 8, 2009 – after over a 34 hour delay

following Dr. Stevenson's declared need to check/review it as is set forth in his 8:25AM note of

May 7, 2009.  These acts of negligence were further seriously compounded when the chest x-ray

was not evaluated in a timely fashion by anyone at B&W until late on the morning of May 9,

2009 – i.e. after an additional 16 plus hour delay, and after Mr. Fertik's discharge by Dr.

Stevenson from B&W.

39.     On the Department of Radiology – Diagnostic Report, there is an incorrect

Clinical Diagnosis listed regarding the chest x-ray when it states "… pneumonia, pulmonary

edema/CHF."  There was no evidence of these clinical conditions in Mr. Fertik.  The B&W

report of Attorney Seaver to the Department of Public Health on May 14, 2011 is factually

inaccurate in stating:

> *The patient was ordered for a chest x-ray on May 8, 2009. The patient had*
> *developed pneumonia after a previous ablation. The x-ray was reviewed by the*
> *attending physician who did not see any evidence of pneumonia.*

In fact, the chest x-ray was ordered by Dr. Stevenson's team early on May 7, 2009.  Moreover,

as B&W and its Risk Manager Attorney Seaver must know, there is no note in the medical

record about an "attending physician" reviewing the chest x-ray on May 8, 2009, nor of any

physician reviewing the chest x-ray prior to Mr. Fertik's May 9, 2009 discharge.  This is due to

the fact that no one at B&W timely did any of those things, nor did anyone at B&W review the

chest x-ray or otherwise diagnose the emboli causing retained Abbott wire until <u>after</u> Mr. and

Mrs. Fertik had left Boston and were in route to their home in New York City.  These were,

individually and collectively, acts of negligence and/or gross negligence by the physician

defendants Drs. Stevenson and Maytin.

40.     Consistent with the applicable standard of care, a chest x-ray should have been

obtained and read in a far more timely fashion on the day of the procedure or early on May 7,

2009.  The indication and description order to the radiologist for the chest x-ray should have

stated it was obtained post-ablation procedure that included a trans-septal approach in a patient

manifesting post procedure unexpected neurological and speech deficits.  These multiple errors

in care compounded the timely diagnosis of the Abbott wire retained object that was the clear

source of multiple embolic damage to Mr. Fertik's brain beginning in the catheterization

laboratory at 6:10 PM on May 6, 2009 when protamine was given.  Thus began the potential life-

threatening, series of blood clot formations and emboli around the wire and subsequent travel to

Mr. Fertik's brain in the hours immediately after Mr. Fertik's procedure and into the days that

followed until the proper diagnosis was made more than <u>three days</u> after the procedure.

41.     The failure of Drs. Stevenson and/or Maytin involved in Mr. Fertik's care –who

were aware of his dysarthria and other stroke symptoms following his May 6, 2009 ablation

procedures – to timely diagnose the retained Abbott wire in his body at the conclusion of, or

shortly following, the May 6, 2009 ablation procedure was negligent.  By the time of

Mr. Fertik's May 9, 2009 B&W discharge, the three plus day delay in diagnosing the retained

Abbott wire constituted further negligence and/or gross negligence by the physicians charged

with his care and on whom Mr. Fertik reasonably relied.  Mr. Fertik's brain damage injuries were

compounded by said delay.  These are medical and diagnostic errors that should never have

happened.  This medical narrative is one where the "liability" dimension of a case is stark and a

credible explanation for the multi-day wrongful delay in diagnosis of the fractured Abbott Wire

lacking.

  42.  In further manifestation of the degree and extent of mismanagement and medical

error in Mr. Fertik's case, B&W sought and received compensation from Medicare for the May

6, 2009 and May 10, 2009 procedures in violation of the October 1, 2008 United State's

Department of Health and Human Services "Never Rule," *See Medicare Program: Changes to*

*the Hospital Inpatient Prospective Payment Systems,* 42 Fed. Reg. Page #48474 (August 19,

2008) which prohibits hospitals seeking compensation from Medicare in cases involving, as here,

a "foreign object retained after a procedure."  Stated directly, such a Hospital Acquired

Condition ("HAC") involving a retained foreign object is deemed a so-called "Never Event" by

Medicare and is non compensable under the applicable federal Medicare regulations: yet B&W

sought and received payment in Mr. Fertik's case.  Of similar fabric, and in the interest of

medical and factual accuracy, B&W and Attorney Seaver's legally required Adverse Event

Report ("AER") dated May 13, 2009 to the United States Food & Drug Administration ("FDA")

stating "minor injury to the patient" in Mr. Fertik's case warrants supplementation to the federal

regulators by B&W and its agents since the AER seriously misstated the operative facts and

degree of neurological injury in fact sustained by Mr. Fertik.

  43.  In the almost three years since his stroke arising from the retained Abbott Wire,

Mr. Fertik has undergone a series of neuropsychological tests which confirm his deficits past and

present.  MRI and other radiological studies of his brain demonstrate that area of brain damage

and brain tissue loss suffered by Mr. Fertik in May 2009 persist today as confirmed by recent

MRI studies of the same cranial area. The brain tissue loss demonstrated in recent MRIs

correlates with an area of infarction in the MRI obtained at B&W Hospital in May 2009. Smaller

and multiple areas of infarction were also demonstrated in the May 2009 film; and their small

size does not preclude a significant contribution to Mr. Fertik's present neurological damages

even though these areas are not as pronounced today.  In short, the brain damage caused to

Mr. Fertik in May 2009 persists to this day and can be seen on MRI studies.

44.     Rehabilative therapy was undertaken in New York City for many months and Mr.

Fertik is at medical end point in his recovery in the view of neurological experts.  Though

improved relative to his mental and cognitive status on and after May 6, 2009, his injuries

persist, are well documented and put him at risk for further cognitive decline and impairment as

he ages, including the heightened risk of early onset dementia.  These damages all arise from the

fractured and defective Abbott Wire, the ensuing embolic events, the extraordinary multi-day

delay in diagnosis that allowed the fractured Abbott wire to remain inside Mr. Fertik's body and

continue to be a source of emboli until May 10, 2009 and the associated acts of medical

negligence and/or gross negligence referenced herein.

### The Spoliation of Evidence

45.     Dr. Stevenson, in connection with and following the removal of the 15.5 inch

Abbott wire, orally informed the plaintiffs that the wire facture was due to it being "… a

defective wire…."  Dr. Stevenson expressly assured the plaintiffs that after the wire was

removed from Mr. Fertik's body by Dr. Eisenhauer it would be safely examined by members of

the B&W Pathology Department and then <u>retained</u> at Brigham & Women's Hospital by

Dr. Stevenson or, per his instructions, by other professionals at B&W.  The Plaintiffs were explicit in their conversations with Dr. Stevenson regarding their expectation that the Abbott wire fragment would be safely preserved and retained at B&W.  Dr. Stevenson assured them it would be.  Axiomatically, the Abbott wire fragment was essential, and among the best, evidence related to its "defective" condition that:  (a) B&W reported to the state and federal regulators and; (b) that Dr. Stevenson reported to the Plaintiffs.  It is uncontested that the plaintiffs asked Dr. Stevenson that he cause the Abbott wire to be retained and placed in a secure location because of the centrality of the wire as key evidence in any claim that might thereafter be undertaken by the plaintiffs against Abbott and/or Abbott Vascular.  The Fertiks expressly and reasonably relied upon Dr. Stevenson's pledge that he would do so.

46.     Notwithstanding the above assurances and pledges of Dr. Stevenson to the Plaintiffs regarding the safe retention and preservation of the 15.5 inch Abbott wire, the wire was in fact willfully thrown away – or negligently allowed to be thrown away -- either by Dr. Stevenson or physician colleagues of his in the B&W Pathology Department to whom Dr. Stevenson provided the wire for examination and testing on or after May 10, 2009.  The exact date of this spoliation of evidence is unknown to the Plaintiffs.

47.     The B&W medical records confirm that the physical examination of the fractured Abbott wire was performed by either or both Drs. Tony Agoston and Alessandra F. Nascimento of the B&W Pathology Department on May 13, 2009.  The May 13, 2009 legally mandated AER form to the FDA, submitted by B&W through Attorney Seaver, textually answered the FDA inquiry:  "Where is the device now?" by stating:  "Retained by the hospital" (emphasis added). This answer by B&W lawyers in the legally required FDA AER form confirms both the knowledge and obligation of B&W and Dr. Stevenson to retain the defective Abbott wire.  While

safe retention of the Abbott wire was perhaps true on May 13, 2009, on a date shortly following

the May 13, 2009 B&W written report to the FDA the Abbott Wire was lost or discarded while

in the care, control and custody of B&W's Pathology Department and/or Dr. Stevenson.

48.     The negligent and/or willful destruction/discarding of the Abbott wire constitutes

"spoliation" of essential evidence and has materially prejudiced Mr. and Mrs. Fertik with respect

to their claims sounding in product liability against Abbott and/or Abbott Vascular.  For this

spoliation appropriate legal sanctions should be imposed by the court.

## COUNT I

### Product Liability:  Negligent/Defective Manufacturing

49.     The Plaintiffs re-allege, as if fully stated herein the facts and allegations set forth

in Paragraphs 1-48 of their Complaint.

50.     Abbott and/or Abbott Vascular caused the Abbott wire (i.e. Abbott Vascular

Devices Hi Torque BHW Wire, Model 1000463H) utilized in Mr. Fertik's May 6, 2009 ablation

procedure at B&W to be manufactured in a negligent and/or defective fashion such that the

Abbott wire was caused by its manufacturing defects to fracture while inside Mr. Fertik's body.

The fracture of the Abbott wire caused a 15.5 inch segment of the wire – as a retained foreign

object -- to remain in and near Mr. Fertik's heart.  It was the source and cause of blood clots

forming in and near Mr. Fertik's heart on and after the evening of May 6, 2009.

51.     The blood clots caused by the Abbott wire in numerous instances travelled to

Mr. Fertik's brain causing him to suffer a series of embolic events/stokes in the period May 6,

2009 until the Abbott wire's removal from Mr. Fertik's body on May 10, 2009. Serious

neurological and cognitive injuries were sustained by Mr. Fertik as a consequence of the embolic

events caused by the negligently and/or defectively manufactured Abbott wire.  Those injuries,

including documented loss of brain tissue by Mr. Fertik, were proximately caused by the

negligent or wrongful acts and inactions of the defendants Abbott and/or Abbott Vascular in

designing, manufacturing and/or distributing the defective Abbott wire which was utilized at

B&W in Mr. Fertik's ablation procedure.  Those defects were the cause of the Abbott wire's

fracture and the resulting injuries suffered by Mr. Fertik all as is more particularly set forth in

Paragraphs 1 through 48 of this Complaint.

     52.     The Plaintiffs have been harmed thereby.

## COUNT II

### Product Liability:  Negligent/Defective Design

     53.     The Plaintiffs re-allege, as if fully stated herein, the facts and allegations of all the

preceding paragraphs of their Complaint.

     54.     Abbott and/or Abbott Vascular caused the Abbott wire (i.e. Abbott Vascular

Devices Hi Torque BHW Wire, Model 1000463H) utilized in Mr. Fertik's May 6, 2009 ablation

procedure at B&W to be negligently and defectively designed such that the Abbott wire was

caused by its design defects to fracture while inside Mr. Fertik's body.  The fracture of the

Abbott wire caused a 15.5 inch segment of the wire – as a retained foreign object -- to remain in

and near Mr. Fertik's heart.  It was the source and cause of blood clots forming in and near Mr.

Fertik's heart on and after the evening of May 6, 2009.

     55.     The blood clots caused by the Abbott wire in numerous instances travelled to

Mr. Fertik's brain causing him to suffer a series of embolic events/stokes in the period May 6,

2009 until the Abbott wire's removal from Mr. Fertik's body on May 10, 2009. Serious

neurological and cognitive injuries were sustained by Mr. Fertik as a consequence of the embolic

events caused by the negligently and/or defectively designed Abbott wire.  Those injuries,

include documented loss of brain tissue by Mr. Fertik, were proximately caused by the negligent or wrongful acts and inactions of the defendants Abbott and/or Abbott Vascular in designing, manufacturing and/or distributing the defective Abbott wire which was utilized at B&W in Mr. Fertik's ablation procedure.  Those defects were the cause of the Abbott wire's fracture and the resulting injuries suffered by Mr. Fertik all as is more particularly set forth in Paragraphs 1 through 48 of this Complaint.

56.     The Plaintiffs have been harmed thereby.

## COUNT III

### Professional Negligence:  Dr. Stevenson and Dr. Maytin

57.     The Plaintiffs re-allege, as if fully stated herein, the facts and allegations of all the preceding paragraphs of their Complaint.

58.     The negligent and/or grossly negligent actions and inactions of Dr. Stevenson and Dr. Maytin referenced above – including but not limited to those which permitted the fractured 15.5 inch Abbott wire to remain undiagnosed and undetected inside Mr. Fertik for over three (3) days – proximately caused and compounded, by said delay in diagnosis, the neurological injuries and number of embolic events suffered by Mr. Fertik in May 2009.

59.     For their professional negligence and departure from the applicable medical standard of care, the Defendants Drs. Stevenson and Maytin are liable to the Plaintiffs for all the injuries Mr. and Mrs. Fertik have been caused to suffer.

60.     The Plaintiffs have been harmed thereby.

## COUNT IV

### Mrs. Fertik's Loss of Consortium/Loss of Companionship and Society

61.     The Plaintiffs re-allege, as if fully stated herein, the facts and allegations of all the

preceding paragraphs of their Complaint.

62.     Mrs. Fertik, who has been happily married to Mr. Fertik since 1977 and often involved in his professional film making career as a trusted assistant and creative partner, was an eye-witness to the events of May 6, 2009 to May 10, 2009 set forth above.  In the period since, she has suffered a loss of consortium and loss of companionship and society of Mr. Fertik due to the behavioral changes and neurological deficits he sustained as a consequence of the negligence and wrongful conduct of the defendants Abbott, Abbott Vascular, Dr. Stevenson and Dr. Maytin set forth above.

63.     Mrs. Fertik has been harmed thereby.

## COUNT V

### Spoliation of Evidence

64.     The Plaintiffs re-allege, as if fully stated herein, the facts and allegations of all the preceding paragraphs of their Complaint.

65.     The spoliation of evidence and destruction/loss of the Abbott wire set forth in Paragraphs 45 through 48 was caused by the actions and/or inactions of Dr. Stevenson – whether negligent or willful – and warrant the imposition of appropriate sanctions and/or evidentiary rulings by the Court in connection with the trial of this case.

66.     The aforementioned spoliation of evidence by Dr. Stevenson – whether negligent or willful (and whether by his own hand or by others at B&W who he negligently failed to instruct or compel to retain the Abbott wire as he had expressly pledged to the Plaintiffs he would do) -- has prejudiced and harmed the Plaintiffs.  For this spoliation of evidence the Plaintiffs are entitled to judicial relief at or before the time of trial of this case.

WHEREFORE, Mr. and Mrs. Fertik demand judgment against the defendants such that:

a)      Judgment enter on behalf of the Plaintiffs on Count I, Count II, Count III, Count IV and Count V of their Complaint and with respect to Count V appropriate sanctions for spoliation of evidence be entered at or before trial;

b)      Plaintiffs be awarded full and complete compensation from the Defendants for their losses and injuries under each of said counts;

c)      Plaintiffs be awarded all statutory pre-judgment and post-judgment interest, and/or attorneys fees and costs, to which they may be legally entitled; and

d)      For such other relief as the Court deems just and warranted.

WILLIAM FERTIK AND GRETA FERTIK,

By their attorneys,


*/s/ Alex H. MacDonald*
Alex H. MacDonald, BBO # 310360
Michael D. Lurie, BBO # 553024
Rebecca Robertson, BBO # 670529
MACDONALD ROTHWEILER
  EISENBERG LLP
One Bowdoin Square
Boston, MA  02114
Tel:  617-747-7550
Fax: 617-747-7551

Dated:  May 3, 2012